**Timothy RILEY, Plaintiff,**

v.

**EMPIRE AIRLINES, INC., Defendant.**

**No. 85–CV–1565.**

United States District Court,
N.D. New York.

June 17, 1993.

Blitman & King, Rochester, NY (Jules L. Smith, of counsel), for plaintiff.

Phillips, Lytle, Hitchcock, Blaine & Huber, Rochester, NY (Michael E. O'Neil, of counsel), for defendant.

## MEMORANDUM–DECISION & ORDER

MUNSON, Senior District Judge.

### I.  BACKGROUND

Plaintiff Timothy Riley, formerly a pilot

with defendant Empire Airlines,[1] brought this action against his former employer for violations of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–188. Plaintiff alleged that Empire Airlines unlawfully discharged him for exercising rights protected by the RLA. Empire Airlines asserted that plaintiff was justifiably discharged based upon his involvement in several incidents reflecting an attitude deemed inappropriate for a captain in Empire Airlines.

Following a non-jury trial, this court determined that plaintiff Riley was wrongfully discharged by Empire Airlines in violation of the RLA. Memorandum–Decision and Order filed August 27, 1991, Document ("Doc.") 57. In that decision, the court found that plaintiff's protected conduct of choosing not to support management's efforts to reach a collective bargaining agreement with the Empire Pilots' Association ("EPA")[2] was one of the contributing factors in his discharge. *Id.* at 27–31. Nonetheless, the court determined that plaintiff's discharge was not motivated by anti-union animus. *Id.* at 36–40. Specifically, plaintiff's RLA-protected right to support a different organization, the Air Line Pilots Association ("ALPA"),[3] was not a substantial or motivating factor in his discharge. *Id.* at 36. Based on the conclusion that plaintiff was wrongfully discharged, the court awarded damages of back pay. The court directed the clerk of the court to enter judgment in favor of plaintiff on the back pay issue, in the amount of $188,547.00 through June 30, 1990 and an additional $3,170.00 per month or $104.22 per day until the date final judgment is entered on all issues. *Id.* at 41–42.

On September 12, 1991, at the request of the parties, this court issued an order amending the Memorandum–Decision and Order of August 27, 1991 as to the entry of judgment. *See* Doc. 58.[4] The court directed

the clerk to enter one judgment at the completion of all proceedings. As part of the August 26, 1991 decision, the court had directed the parties to file supplemental briefing on the issues of reinstatement, front pay, pension benefits, and punitive and compensatory damages, and it was determined that one judgment disposing of these claims as well as the claims already decided was the desirable way to proceed. The parties have submitted a variety of supplemental post-trial briefs and letters relating to the availability and appropriateness of reinstatement, front pay, and punitive and compensatory damages on the facts of this case. The court will discuss each issue below and render its final decision pursuant to Fed.R.Civ.P. 52(a).

## II. DISCUSSION

### A. *Reinstatement and Front Pay*

#### 1. Reinstatement

As a result of the court's August 27, 1991 decision, USAir consented to reinstate plaintiff with all seniority and benefits which would have accrued, had termination not occurred. Defendant's Supplemental Post–Trial Memorandum, Doc. 60, at 1. Hence, the court need not address the availability or appropriateness of reinstatement in this case. However, defendant asserts that its unconditional offer of reinstatement has an impact on plaintiff's right to front pay and also constitutes a "cut-off" date for the continuing accrual of back pay damages awarded in the court's August 27, 1991 decision. Defendant's Post–Trial Letter dated December 17, 1992, Doc. 63, at 2. As authority for this proposition defendant cites *NLRB v. Browne*, 890 F.2d 605 (2d Cir.1989) and *Canova v. NLRB*, 708 F.2d 1498 (9th Cir.1983).

---

1. Empire Airlines, formerly a commuter airlines based in Utica, New York, is now owned and operated by USAir.

2. The EPA was an informal representative group of pilots that formed to assist Empire's pilots in resolving problems with management.

3. ALPA is a national labor organization that represents pilots.

4. The September 12, 1991 Order incorrectly states that the August 27, 1991 Memorandum–Decision and Order granted partial summary judgment, when in fact that decision awarded partial relief after a nonjury trial. The clerical error does not affect the validity of the amending order, and the clerk of the court has proceeded as directed in the amending order.

Plaintiff has not responded to this argument.[5]

■ The cited cases establish that an offer of reinstatement "must be firm, clear and unconditional" in order to be effective. *Browne*, 890 F.2d at 609. Specifically, "an employer may toll its back pay liability by offering reinstatement to employees improperly dismissed, but a 'full and unconditional offer of reinstatement to the employee's former position is required.'" *Canova*, 708 F.2d at 1505 (quoting *Oil, Chemical & Atomic Workers Int'l Union v. NLRB*, 547 F.2d 598, 601 n. 3 (D.C.Cir.1976), *cert. denied*, 429 U.S. 1078, 97 S.Ct. 823, 50 L.Ed.2d 798 (1977)). *Cf. Clarke v. Frank*, 960 F.2d 1146, 1151 (2d Cir.1992) (in context of Title VII action, back pay no longer accrues once employer makes unconditional offer to reinstate and employee rejects the offer). There is no question in the case at bar that defendant's offer of reinstatement contained in its Supplemental Post–Trial Memorandum is firm, clear, and unconditional. Doc. 60, at 1. Not only did defendant unequivocally offer to reinstate plaintiff, but it also included in the offer all seniority and benefits which would have accrued had plaintiff not been terminated, less any appropriate credits. *Id.* Although plaintiff responded to other points contained in defendant's Supplemental Post–Trial Memorandum by letter to the court dated November 4, 1991, *see* Doc. 61, plaintiff did not address defendant's offer of reinstatement.[6] This lack of express response, coupled with the fact that plaintiff is currently employed with another entity, lead the court to conclude that plaintiff has rejected defendant's offer of reinstatement. Such rejection of a valid offer precludes plaintiff from recovering further back pay damages under the principles cited in *Browne*, *Canova*, and *Clarke*, notwithstanding the court's

ruling in its August 27, 1991 Memorandum–Decision and Order, Doc. 57, that back pay damages would continue to accrue at $104.22 per day until the date the final judgment in this case is entered. Thus, defendant's liability for back pay is tolled as of October 29, 1991, the date the unconditional offer of reinstatement was extended to plaintiff via the filing of defendant's post-trial submission. *See* Doc. 60.

### 2. Front Pay

By letter to the court dated November 4, 1991, plaintiff withdrew his request for an award of front pay. Plaintiff's Post–Trial Letter dated November 4, 1991, Doc. 61, at 1. Therefore, the court dismisses plaintiff's claim for front pay as a component of the damages sought for his wrongful termination in violation of the RLA.

### B. *Punitive and Compensatory Damages*

The only remaining issues involve plaintiff's claims for punitive and compensatory damages. The task before the court is first to determine the scope of remedies available under the RLA in a wrongful discharge action by an employee against an employer, and second to determine whether any of the available remedies are appropriate in this case. Specifically, the issues remaining to be decided are: (1) whether punitive damages are available as a matter of law under the RLA; (2) whether punitive damages are appropriate in this case; (3) whether compensatory damages are available as a matter of law under the RLA; and (4) whether compensatory damages are appropriate in this case.

### 1. Punitive Damages

Plaintiff asserts that, under the Railway Labor Act, punitive damages are available

---

5. Plaintiff withdrew his claim for front pay by letter to the court dated November 4, 1991. *See* Doc. 61; *see also infra* Section II(A)(2). Hence the first prong of defendant's argument, that its offer of reinstatement has an impact on plaintiff's right to front pay, is irrelevant. The court will not address any further the first prong of defendant's argument.

6. The court notes that neither party expressly dealt with plaintiff's entitlement to damages in the form of lost pension benefits or other fringe

benefits. Given the parties' failure to address this issue, defendant's unconditional offer of reinstatement including seniority and benefits, and plaintiff's subsequent withdrawal of his claim for front pay, it does not appear that plaintiff has a valid claim for lost benefits, or at least he does not intend to pursue it. Therefore, the court dismisses plaintiff's damage claim to the extent that it is premised on lost pension benefits or other fringe benefits.

and appropriate as a consequence of defendant's conduct. Plaintiff's Post–Trial Brief, Doc. 54, at 79; Plaintiff's Post–Trial Letter dated November 4, 1991, Doc. 61, at 1–3; Plaintiff's Supplemental Post–Trial Letter dated December 15, 1992, Doc. 62, at 1. In support of this argument, plaintiff primarily relies on *Brown v. World Airways, Inc.*, 539 F.Supp. 179 (S.D.N.Y.1982) and *CSX Transp., Inc. v. Marquar*, 980 F.2d 359 (6th Cir.1992), but also cites *Belton v. Air Atlanta, Inc.*, 647 F.Supp. 28 (N.D.Ga.1986); *Harrison v. United Transp. Union*, 530 F.2d 558 (4th Cir.1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976); *Int'l Association of Machinists v. Jet America Airlines*, 115 L.R.R.M. 3283 (C.D.Cal.1983); and *Holt v. Southern Railway Co.*, 320 F.Supp. 864 (E.D.Tenn.1970).

In *Brown*, an employee brought suit against his employer alleging that he was discharged from employment because he was engaged in efforts to unionize co-employees. The employer made a motion to strike plaintiff's demand for all damages other than back pay. The court declined to strike plaintiff's demand for damages for emotional distress, injury to reputation, and punitive damages, having found no statutory provisions or judicial decisions which would restrict an award of compensatory or punitive damages on the facts of that case, where the employer rather than a union was being sued for conduct in violation of the RLA. *Brown*, 539 F.Supp. at 181. Moreover, the court determined that "there are very strong policy reasons for allowing the recovery of damages other than back pay in an appropriate case." *Id.* Such policy reasons include deterring conduct by an employer who illegally seeks to hinder the unionizing activities of its employees, and through this deterrence foster the legislative goals of facilitating collective bargaining and achieving industrial peace. *Id.* (citing *International Bhd. of Electrical Workers v. Foust*, 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979)).

In *Marquar*, the Sixth Circuit was faced with the issue of whether, under the RLA, a railroad may recover monetary damages against a union for an illegal strike over a minor dispute. The court affirmed without opinion the district court's dismissal of the damages claim, which was based on the rationale that Congress had not "affirmatively approved such remedies" and no other court had allowed damages in that type of case. *Marquar*, 980 F.2d at 360. Judge Batcheller dissented and filed an opinion, to which Judges Guy and Jones responded by filing the opinion of the court concurring in part with the dissent. *Id.* at 360, 379. The judges concurred that "damages are available under the RLA in some circumstances" but held that damages were not appropriate in that case. *Id.* at 379.

The judges relied on the framework set forth by the Supreme Court in *Franklin v. Gwinnett County Public Schools*, —— U.S. ——, ——, 112 S.Ct. 1028, 1032, 117 L.Ed.2d 208 (1992), to resolve the question of what damages are available when the statute at issue is silent on remedies. "[T]he Supreme Court clarified the analysis that must be used to determine whether a particular remedy is available under a federal statute. Once an implied right of action has been found, a court must 'presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise.'" *Marquar*, 980 F.2d at 379 (quoting *Franklin*, —— U.S. at ——, 112 S.Ct. at 1032). Noting that the RLA contains no provisions for private enforcement but that the legislative history indicates Congress' intent without restriction for the courts to develop remedies, the *Marquar* court concluded that a full range of remedies are available under the RLA. Nonetheless, the court ruled that damages were not appropriate against the union in that particular case because plaintiff failed to demonstrate why traditional equitable remedies were inadequate, but more importantly because the threat of a substantial damage award against the union would allow management an unmatched mechanism for "keep[ing] the union 'in line' and the employees off the picket line" in a strike situation whether the dispute is characterized as major or minor, based on the nebulous quality of that characterization. *Id.*, 980 F.2d at 382. The *Marquar* court summarized its disinclination to award damages against the union by stating that "an award of damages would change the careful balance between labor and

management that has evolved in the 66 years since the RLA was enacted." *Id.* Drawing on the conclusions in *Brown* and *Marquar* that a full range of remedies are available under the RLA, plaintiff at bar urges the court to deem the circumstances of this case appropriate for an award of punitive damages.

Defendant argues in opposition that punitive damages are not available under the RLA. Defendant's Supplemental Post–Trial Brief, Doc. 60, at 7; Defendant's Supplemental Post–Trial Letter dated May 7, 1993, Doc. 64, at 2. In support of its argument, defendant cites *International Bhd. of Electrical Workers v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979) (no punitive damages against union for breach of duty of fair representation under RLA); *Republic Steel Corp. v. NLRB,* 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940) (no punitive damages against employer for unfair labor practices in violation of National Labor Relations Act); *Deboles v. Trans World Airlines, Inc.,* 552 F.2d 1005 (3d Cir.), *cert. denied,* 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977) (affirming district court's entry of judgment that rejected claim for punitive damages against union, highlighting general policy of federal labor laws to provide remedies rather than punishments); *Tipton v. Aspen Airways, Inc.,* 741 F.Supp. 1469 (D.Colo.1990) (declining to exercise jurisdiction over pendent state claims in part because relief sought on such claims, including punitive damages, was "more comprehensive than that allowed for [plaintiff's] RLA claim"); *Maas v. Frontier Airlines, Inc.,* 676 F.Supp. 224 (D.Colo.1987) (striking punitive damage claim against employer for terminating employee engaged in RLA-protected activities); and *Brotherhood of Railway Carmen of United States and Canada v. Delpro Co.,* 579 F.Supp. 1332 (D.Del.1984) (dismissing punitive damage claim against employer for allegedly failing to bargain in good faith and unilaterally changing terms of employment in violation of RLA). Defendant points out that none of the cases cited by plaintiff actually awarded or upheld an award of punitive damages under the RLA.

Furthermore, defendant argues, even if punitive damages are available as a matter of law, the actions of defendant in the instant case do not rise to a level which would render punitive damages appropriate. Defendant's Supplemental Post Trial Brief, Doc. 60, at 10. Defendant asserts that the purpose for punitive damages as recognized in *Brown* is not present in the case at bar. The *Brown* court indicated that punitive damages would be appropriate against an employer to deter rapid-fire terminations and reinstatements by the employer made in an effort to discourage employee organizing campaigns. There is no such conduct by defendant employer in this case. Indeed, the employer was unaware of plaintiff's union-organizing activities, and in any event the management responsible for plaintiff's termination is no longer in place. Thus, defendant asserts, the purpose of an award of punitive damages under the *Brown* rationale is not relevant here. *Id.* at 11. For all of these reasons, defendant argues that punitive damages are not available, nor appropriate, under the circumstances of this case.

#### a. *Availability of Punitive Damages*

Generally, "the existence of a statutory right implies the existence of all necessary and appropriate remedies" and, except when expressly delineated by Congress, "courts may use any available remedy to make good the wrong done." *Franklin v. Gwinnett County Public Schools,* — U.S. at —, 112 S.Ct. at 1033–34 (internal quotations and citations omitted). Because Congress has not specified what remedies are available under the RLA, courts are left to rule on the availability of punitive damages on a case by case basis in a manner "that will best effectuate the purposes of the Railway Labor Act, recognizing that the overarching legislative goal is to facilitate collective bargaining and to achieve industrial peace." *International Bhd. of Electrical Workers v. Foust,* 442 U.S. at 47, 99 S.Ct. at 2125 (citations omitted).

As noted by defendant, a number of courts have held that punitive damages are not available against an employer because such damages contradict the remedial nature of the RLA. *E.g., Maas v. Frontier Airlines,* 676 F.Supp. at 227; *Grosschmidt v. Chautauqua Airlines, Inc.,* 1986 WL 10077 (N.D.Ohio 1986); *Brotherhood of Railway*

*Carmen v. Delpro,* 579 F.Supp. at 1337–38. These courts indicate that an employer's duty under the RLA is enforceable with equitable relief, including compensation to the employee for actual damages suffered as a result of the employer's breach, and thus there is no justification for imposing a penalty such as punitive damages. Indeed, "introducing punitive damages on the labor scene may have a detrimental effect on the congressional goal of furthering congenial labor relations between union and management." *Delpro,* 579 F.Supp. at 1336.

Other courts have held, however, that punitive damages are available against an employer for violations of the RLA in certain circumstances. The *Brown* case relied upon by plaintiff at bar recognized that, "where the employee is not represented by a union which can protect his interests through collective bargaining or other methods, he lacks the power ... to prevent an employer's abuses." *Brown,* 539 F.Supp. at 181. The availability of punitive damages in such a case, to deter the employer who illegally seeks to hinder the organizing efforts of its employees, does serve to further the goals of collective bargaining and industrial peace. *Id.* Thus, the *Brown* court opined, "there are special reasons for awarding punitive damages in a case where the employee is not represented by a union." *Id.; see also Freiburger v. Emery Air Charter, Inc.,* 795 F.Supp. 253, 260–61 (N.D.Ill.1992) (same); *Belton v. Air Atlanta, Inc.,* 647 F.Supp. 28, 32 (N.D.Ga.1986) (same); *International Association of Machinists v. Jet America Airlines,* 115 L.R.R.M. 3283, 3284 (C.D.Cal.1986) (the policies and purposes of the RLA "will best be effectuated by the provision of a full range of remedies, including punitive damages").

The *Delpro* line of cases and the *Brown* line of cases are reconcilable upon close examination of the facts. While *Delpro* involved unionized employees against their employer, *Brown* involved a non-unionized employee against his employer. This important factual distinction allows the holdings to co-exist, as each rationale was tailored for a specific set of facts.[7] *See Freiburger,* 795 F.Supp. at 260 (on motion to strike punitive damages claim of non-unionized employee against employer, court followed *Brown* to deny motion, noting that "the rationale of *Delpro* is based on the balance of power between unions and management which is clearly not present in a case where the employee is not represented").

Although the case before this court is unique because the type of anti-union activity referred to in *Brown* and its progeny has already been rejected with the court's determination that plaintiff's discharge was not motivated by anti-union animus, *see* Memorandum–Decision and Order, Doc. 57, at 36–40, still this is a case for which punitive damages are available as a matter of law under the *Brown* rationale. The case involves an employee who did not support efforts by his employer to reach a collective bargaining agreement with the EPA, but rather supported the union-organizing efforts of a different entity, the ALPA, with whom no collective bargaining negotiations were underway. *Id.* at 17–22. Plaintiff Riley's interests were not being represented by the EPA because he did not support that association, nor were his interests being represented by the ALPA because that union was not in a position to collectively bargain with plaintiff's employer. Based on these facts, the court finds that plaintiff Riley fits snugly

---

7. One court failed to note this factual distinction between *Delpro* and *Brown.* The District of Colorado, deciding on a pretrial motion to strike an employee's claim for punitive damages against her employer, stated that *"Brown* clearly runs counter to the majority view that punitive damages are unavailable against an employer under the RLA." *Maas,* 676 F.Supp. at 226. Without analysis the court asserted that the *Delpro* court had rejected the reasoning of *Brown.* Also without analysis the court stated, "[w]e find that the better view is that punitive damages under the RLA are not permitted." *Id.* at 227. This court disagrees with the conclusory assertions of the *Maas* court. While it is true that the *Delpro* court did not follow the holding in *Brown,* the *Delpro* court considered and distinguished *Brown* on factual grounds, and carefully structured its own analysis to address the labor-management controversy before it. *See Delpro,* 579 F.Supp. at 1336 ("To allow a threat of unpredictable punitive awards against employers, where unions sitting opposite them at the bargaining table are immune from such threats, would unfairly multiply the unions' arsenal of negotiating weapons.").

within the category of plaintiffs for whom the *Brown* rationale was tailored: he was an employee who was "not represented by a union which [could] protect his interests through collective bargaining or other methods...." *Brown,* 539 F.Supp. at 181. The respective negotiating arsenals of labor and management therefore are not relevant in the instant case, and it is on this basis that the court distinguishes *Delpro.* Notwithstanding defendant's argument that plaintiff, by opposing the efforts of management to negotiate with the EPA bargaining group, disrupted the legislative goals of collective bargaining and industrial peace, this court finds that defendant's decision to terminate plaintiff in violation of his RLA-protected rights was also disruptive of collective bargaining and industrial peace. Thus, this case is one for which punitive damages are available as a matter of law.

#### b. *The Appropriateness of Punitive Damages*

In light of the court's determination that punitive damages are available as a matter of law, the court must now address the issue of whether an award of punitive damages is appropriate on the facts of this case. The parties cite no cases in which punitive damages actually were awarded against an employer for violations of the RLA. The sole decision this court has uncovered involves a punitive damage award against an employer for exerting blatantly anti-union pressure on its employees to discourage organizing activities. *Schlang v. Key Airlines, Inc.,* 794 F.Supp. 1493 (D.Nev.1992). Such pressures included: (1) threatening employees about their future with the company; (2) raising salaries to bribe employees away from voting for a union; (3) trying to terminate leaders of the union movement; (4) holding coercive meetings with employees; (5) threatening to resign as management; (6) threatening that the company would lose contracts if the union was approved; 7) promoting flight engineers to pilots in order to change the vote balance; (8) telling pilots that salaries, bonuses, and benefits would be frozen for years; (9) ordering one employee to stay in an unheated airport overnight while others went to a hotel; and (10) ordering one employee, who had just returned from a long international flight and had no further duty scheduled, to continue on "to Las Vegas on a deadhead flight or else find his own way home" rather than go to an already-rented hotel room to rest. *Schlang,* 794 F.Supp. at 1511–12. Finding that the employer "maliciously, wilfully and deliberately attempted and intended to stamp out any cockpit crew members' union before it could come into being," the *Schlang* court awarded punitive damages of $500,000.00. *Id.* at 1511, 1513. The court reasoned that "[p]unitive damages should ensure that the Defendants will never again harass, intimidate, threaten or discharge their employees" for asserting RLA-protected rights. *Id.* at 1513. Moreover, the court expressed an underlying rationale that awarding punitive damages against the employer would serve to deter others from following that employer's example. *Id.* at 1512.

■ A three-part test can be discerned from the *Schlang* decision to assess the appropriateness of punitive damages against an employer for violations of the RLA. First, the court should consider the employer's pattern of harassment against the union organizers and other employees, including the deliberateness and severity of the employer's conduct. Second, the court should take into account the specific deterrent effect such an award will have on management and the general deterrent effect it will have on other employers. Third, if an award is appropriate based on the first two parts, the court should set the specific dollar amount of the award based on the net worth of the employer, taking into consideration the net worth of its parent entity and any subsidiary entities it may have. *See Schlang,* 794 F.Supp. at 1511–13.

■ In the case at bar, defendant's actions fall far short of the degree of oppression found in *Schlang.* Although there is evidence of defendant's hostility toward its pilots' attempts to organize under ALPA, Memorandum–Decision and Order, Doc. 57, at 19–22, there was only one hostile confrontation between plaintiff Riley and management prior to his unlawful termination. Plaintiff's Post–Trial Brief, Doc. 54, at 49. Indeed, it was the lack of any warning signs

or prior harassment that shocked plaintiff upon being confronted with the list of "transgressions" which ultimately led to his termination. *Id.* at 80. Based on these facts, the court cannot conclude that a pattern of deliberate and malicious conduct existed on the part of defendant to curb plaintiff's union activities like the one that existed in *Schlang.* It is worth noting that this court found no direct evidence that defendant was even aware of plaintiff Riley's ALPA-affiliated activities at the time he was terminated. *See* Memorandum–Decision and Order, Doc. 57, at 36–39. Moreover, it is unclear from the record whether there was any conduct which might rise to the level of a pattern of managerial harassment toward other airline employees like the pattern that existed against both engineers and flight attendants in *Schlang.* For all of these reasons, the court does not find defendant's conduct at bar sufficiently pervasive or severe to warrant the imposition of punitive damages under the first part of the *Schlang* test.

As for the second part of the test, in the present case punitive damages would have little, if any, specific deterrent effect on defendant. Empire Airlines is now part of USAir. The management responsible for plaintiff's unlawful discharge is no longer in place. The pilots are organized under ALPA, and have successfully negotiated collective bargaining agreements to govern labor-management relations. *See* Defendant's Supplemental Post–Trial Brief, Doc. 60, at 11; Defendant's Supplemental Post–Trial Letter dated May 7, 1993, Doc. 64, at 2–3. Thus, the specific deterrent to continuation or future repetition of anti-union conduct crafted by the punitive damage award in *Schlang* is not relevant in this case. Similarly, the general deterrent to other employers effected by a punitive damage award under circumstances such as this is of little relevance, given the unique factual scenario in this case. The court finds it unlikely that an award of punitive damages against defendant at bar for discharging plaintiff in part for exercising his RLA-protected right to choose not to support defendant's bargaining efforts with a union he did not advocate, would act as a deterrent to other employers, particularly since there was no corresponding determination that the discharge was also motivated by anti-union animus.

Because the court finds neither of the first two parts of the *Schlang* test to warrant imposition of punitive damages, the court need not address the third part regarding a specific dollar amount. In sum, despite the availability of punitive damages as a remedy under the RLA, the court holds that an award of punitive damages is not appropriate in this case. Therefore, plaintiff's claim for punitive damages is dismissed.

### 2. Compensatory Damages

■ Plaintiff asserts that he is entitled to compensatory damages for emotional distress and injury to his reputation. As authority, plaintiff cites the cases' previously mentioned regarding the availability of a full range of remedies, again relying primarily on *Brown,* 539 F.Supp. 179, and *Marquar,* 980 F.2d 359. Plaintiff argues that an award of damages for emotional distress may be supported solely by the plaintiff's testimony, and that his trial testimony illustrates the appropriateness of such an award in this case. Plaintiff's Post–Trial Brief, Doc. 54, at 80–82; Plaintiff's Post–Trial Letter dated November 4, 1991, Doc. 61, at 3. To support his argument, plaintiff cites *Chalmers v. City of Los Angeles,* 762 F.2d 753, 761 (9th Cir.1985); *Williams v. Trans World Airlines, Inc.,* 660 F.2d 1267, 1272–73 (8th Cir.1981); *Machleder v. Diaz,* 618 F.Supp. 1367, 1370–73 (S.D.N.Y.1985), *rev'd on other grounds,* 801 F.2d 46 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987); and *Vasbinder v. Ambach,* 1990 WL 59381 (N.D.N.Y. April 30, 1990) (McAvoy, J.), *aff'd on other grounds,* 926 F.2d 1333 (2d Cir. 1991).

In response, defendant argues that compensatory damages are not available under the RLA. Defendant's Supplemental Post–Trial Brief, Doc. 60, at 12–13; Defendant's Supplemental Post–Trial Letter dated May 7, 1993, Doc. 64, at 1–3. As authority for this proposition, defendant relies on *Lewy v. Southern Pacific Transp. Co.,* 799 F.2d 1281, 1295 (9th Cir.1986), but also cites *Maas,* 676 F.Supp. 224 and *Louisville and Nashville*

*Railroad v. Brown,* 252 F.2d 149 (5th Cir.), *cert. denied,* 356 U.S. 949, 78 S.Ct. 913, 2 L.Ed.2d 843 (1958).

In *Lewy,* the plaintiff was injured in a job-related accident. When he refused to submit to an examination by the company's physician after approximately six months of convalescence, his employer convened a disciplinary proceeding which resulted in his termination for insubordination and misrepresentation of his physical condition. Lewy appealed to the National Railroad Adjustment Board, and the Board ordered his reinstatement based on procedural defects in the disciplinary proceeding. Lewy then sued his employer under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60, seeking damages for lost wages, lost future wages, and medical expenses. Lewy also sought damages for the alleged aggravation, as a result of his improper discharge, of preexisting emotional injuries which were sustained during his accident. The court rejected all of Lewy's discharge-related claims, including the claim for aggravated emotional damages. *Lewy,* 799 F.2d at 1292–97. In so holding, the *Lewy* court discussed the difference between the FELA, a statute intended "to create a tort remedy for railroad workers injured on the job," *id.* at 1287 (internal quotations omitted), and the RLA, a statute intended "to promote stability in the railroad industry and to provide prompt and efficient resolution of labor-management disputes arising out of railroad collective bargaining agreements." *Id.* at 1289. The court then stated, in dicta:

> [T]he Supreme Court and our court have concluded in a series of cases that in enacting the RLA, Congress consciously intended to minimize litigation of railroad labor disputes in the state and federal courts and to limit wrongfully discharged employees to the remedies of reinstatement and back pay.

*Id.* at 1295 (citations omitted). Defendant at bar points to this excerpt as support for its position that "compensatory damages are

outside the scope of the 'remedial' intent" of the RLA. Defendant's Supplemental Post-Trial Brief, Doc. 60, at 13.

Defendant also asserts that plaintiff makes an incorrect assumption that the authority he cites in support of punitive damages applies to compensatory damages as well. *Id.* at 12–13. Finally, defendant argues, even if the court were to adopt the position that compensatory damages are available as a matter of law under the RLA, plaintiff's proof is insufficient to establish his entitlement to such damages in this case. *Id.* at 13.

### a. *The Availability of Compensatory Damages*

The court holds, as it did on the issue of punitive damages, that because Congress has not specified whether compensatory damages are available under the RLA courts must make this determination on a case by case basis in a manner consistent with the overarching legislative goals of the RLA. *See International Bhd. of Electrical Workers v. Foust,* 442 U.S. at 47, 99 S.Ct. at 2125 (citations omitted); *see also Marquar,* 980 F.2d at 379. Both the *Brown* court and the *Schlang* court stated that compensatory damages are available under the RLA, although neither court expressly analyzed the issue nor actually awarded such damages. *Brown,* 539 F.Supp. at 180–81; *Schlang,* 794 F.Supp. at 1510.

Given the remedial objectives of national labor policy, and particularly the goal of making wrongfully discharged employees whole,[8] this court concludes as a matter of law that compensatory damages are available in appropriate cases for violations of the RLA. Indeed, the rationale is stronger on the issue than on the issue of punitive damages. Because compensatory damages are designed to compensate the employee for real losses incurred as a result of the employer's unlawful conduct, such damages are fully consistent with the remedial objectives of national labor policy. No argument can be raised that they take the form of "private

---

8. *See Foust,* 442 U.S. at 49, 99 S.Ct. at 2126 ("relief in each case should be fashioned to make the injured employee whole") (citing *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 206–07, 65 S.Ct. 226, 233–34, 89 L.Ed. 173 (1944));

*see also Republic Steel Corp. v. NLRB,* 311 U.S. 7, 12, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940) (among other remedies, employer may be ordered to "restore and make whole employees who have been discharged in violation of the [NLRA]").

fines" as has been suggested with regard to punitive damages under the RLA. *See Foust*, 442 U.S. at 48, 99 S.Ct. at 2125 (citation omitted). Moreover, this court is of the opinion that the availability of compensatory damages, like the availability of punitive damages in this limited context, serves to further the overarching legislative goals of collective bargaining and industrial peace by offering another layer of protection to unrepresented employees against potential abuses by their employers. *Cf. Brown*, 539 F.Supp. at 181.

The *Lewy* decision relied on by defendant is distinguishable from the instant case. The key issue in *Lewy* was not whether compensatory damages are available under the RLA for a wrongful discharge, but rather whether a plaintiff can proceed with discharge-related claims under the FELA. The court rejected Lewy's attempt to use the FELA to bypass the procedures established under the RLA to address such claims, ruling that all of Lewy's discharge-related claims must be dismissed, including the claim for aggravated emotional damages. *Lewy*, 799 F.2d at 1292-97. This court declines defendant's bidding to interpret the *Lewy* rationale as a definitive statement on the availability of compensatory damages under the RLA. The *Maas* decision relied on by defendant similarly offers little support for defendant's position in this case. The *Maas* court noted the equivocal nature of the compensatory damage issue in ruling that Ms. Maas would not be permitted to amend her complaint to assert a claim for loss of real estate as a result of her allegedly illegal termination. *Maas*, 676 F.Supp. at 227. Thus, the *Maas* court's conclusion that "... the RLA was not intended to cover compensatory damages *of the type asserted by plaintiff*," *id.* (emphasis added), does not preclude consideration of other types of compensatory damage claims such as the claim for emotional distress presently before this court.

### b. *The Appropriateness of Compensatory Damages*

The court turns finally to the parties' arguments on the appropriateness of an award of compensatory damages on the facts of this case. Although no dollar figure for emotional damages was quoted on the record, plaintiff asserts that his testimony revealed the emotional distress suffered and the injury to his professional reputation sustained as a result of his wrongful discharge. Plaintiff described his emotional distress by stating, "... all my life I had worked to become an airline pilot and I finally achieved a position as a captain and I was well on my way as to what my career goal was and to get fired for absolutely nothing I was absolutely devastated and I thought my career was over at that point." Plaintiff's Post-Trial Brief, Doc. 54, at 27, 81 (quoting transcript). Plaintiff candidly added that "I was just crying all night long ... and ... I couldn't even face my parents." *Id.* The testimony of David Goldman, a fellow pilot who shared an apartment with plaintiff Riley during the period surrounding his termination, fully supported plaintiff's statements about his emotional devastation. *Id.* at 35-36 (quoting transcript). Goldman testified that during the three or four weeks after plaintiff Riley's termination he "... was terribly upset, couldn't sleep, couldn't eat, pacing the floors awake all hours." *Id.*

Plaintiff also testified regarding the injury to his professional reputation and the difficulty he faced in finding another job during the eight ·month period following his wrongful termination. Plaintiff conveyed his frustration by stating, "[y]ou go out for an interview, how do you put down on your application that you just don't know why you were fired? And I was very concerned about getting a job, I kept sending out resumes and was getting nothing in return whereas before I was getting everything in return." *Id.* at 27-28 (quoting transcript). Plaintiff related a specific incident involving an interview with Continental Airlines in which the airline representative acknowledged plaintiff's qualifications but refrained from offering him a position. According to plaintiff, the Continental representative stated that plaintiff "had no credibility" because there was no explanation for the termination from his last job. *Id.* at 28, 82 (quoting transcript). Based on this testimony, plaintiff contends that compensatory damages for emotional distress and injury to his professional reputation are appro-

priate in this case. Plaintiff's Post–Trial Letter dated November 4, 1991, Doc. 61, at 3.

Defendant argues in opposition that plaintiff's proof regarding emotional injuries is inadequate. Defendant points out that "plaintiff provided no expert proof regarding the emotional injuries, if any," and "sought no treatment for these alleged injuries." Defendant's Supplemental Post–Trial Brief, Doc. 60, at 13. Moreover, according to defendant, plaintiff failed to offer proof of any sort to substantiate his injuries, quantify the value of such injuries, or measure his resulting loss. *Id.* For these reasons, defendant contends that plaintiff's request for compensatory damages should be denied.

The court disagrees. Despite that fact that plaintiff did not place a dollar value on his injuries, the court finds sufficient evidence in the record to entitle plaintiff to an award of compensatory damages for emotional distress and injury to his professional reputation caused by defendant's unlawful conduct. *See Chalmers v. City of Los Angeles,* 762 F.2d at 761 (sustained award of $12,-500.00 for emotional distress based solely on plaintiff's testimony regarding anguish, embarrassment, anxiety, and humiliation as a result of defendant's due process violation); *Williams v. Trans World Airlines,* 660 F.2d at 1272–73 (reversed and remanded district court's denial of emotional damage claim which was based on failure to adduce evidence of actual dollar value of injury; circuit court stated that "specific proof of out-of-pocket losses or medical testimony, although relevant, is not necessary" and further that "plaintiff's own testimony may be solely sufficient to establish humiliation or mental distress"). Such damages obviously are subjective. However, where the proof demonstrates, as it does in this case, that plaintiff suffered emotional distress and damage to his professional reputation as a result of his termination in violation of the RLA, the court must quantify the damage. *Cf. Busche v. Burkee,* 649 F.2d 509, 519 (7th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) (under § 1983, affirmed $10,000.00 award for depression, moodiness, marital difficulties, and financial difficulties suffered by police officer terminated without

due process); *Miner v. City of Glens Falls,* 1992 WL 349668, **11–12 (N.D.N.Y. November 12, 1992) (Munson, Sr.J.) (under § 1983, awarded $12,500.00 for depression, reemployment difficulties, and financial difficulties suffered by police officer terminated without due process); *Carrero v. New York City Housing Authority,* 1990 WL 104007, *9 (S.D.N.Y. July 13, 1990) (on remand of § 1983 claim, $12,500.00 awarded for sexual harassment, humiliation, and emotional distress); *Richards v. New York City Bd. of Education,* 668 F.Supp. 259, 267 (S.D.N.Y. 1987), *aff'd without opinion,* 842 F.2d 1288 (2d Cir.1988) ($15,000.00 awarded for personal anger and humiliation at being passed over for promotion as a result of racial discrimination). Plaintiff's testimony reveals that, although the impact of his termination was not so serious as to require professional treatment, he did suffer emotional distress and injury to his professional reputation. *See* Plaintiff's Post–Trial Brief, Doc. 54, at 27–28, 81–82 (quoting transcript); *see also id.* at 35–36 (Goldman testimony corroborating plaintiff's description of his emotional devastation). The court finds, on the basis of this testimony, that plaintiff is entitled to an award of $5,000.00 in compensatory damages.

## III. CONCLUSION

In summary, plaintiff's claims for reinstatement and front pay are dismissed based upon defendant's unconditional offer of reinstatement conveyed to plaintiff on October 28, 1991, and plaintiff's post-trial letter to the court dated November 4, 1991. Plaintiff's claim for lost pension benefits and other fringe benefits is also dismissed. For the reasons stated in this decision, plaintiff's claim for punitive damages is denied. Plaintiff's claims for back pay and compensatory damages are granted. The court previously concluded in its August 27, 1991 Memorandum–Decision and Order, as amended by Order dated September 12, 1991, that plaintiff is entitled to an award of back pay in the amount of $188,547.00 through June 30, 1990 and an additional $3,170.00 per month or $104.22 per day until the date final judgment is entered in this matter. However, based on defendant's unconditional offer of reinstatement on October 29, 1991, plaintiff is not

entitled to back pay for any period of time after that date. Therefore, plaintiff's back pay award will include the lump sum through June 30, 1990 plus the fifteen months and twenty-nine days from July 1, 1990 through October 29, 1991. The court calculates this award using the following formula: $188,547.00 + (15 \text{ months} \times \$3,170.00) + (29 \text{ days} \times \$104.22) = \$239,119.38$. Plaintiff is awarded $239,119.38 in back pay,[9] plus $5,000.00 in compensatory damages for emotional distress and injury to his professional reputation. The clerk of the court is directed to enter judgment accordingly.

It is So Ordered.

See also 817 F.Supp. 336.

---

**9.** No claim for prejudgment interest on this award of back pay has been asserted by plaintiff. The court therefore rules that plaintiff has waived any right to prejudgment interest.